**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| NANCY J. ROWKER, | : | |
| Plaintiff | : | No. 3:16-cv-02174 |
| | : | |
| v. | : | (Judge Kane) |
| | : | |
| METHODIST HOMES FOR THE | : | |
| AGING, a/k/a UNITED METHODIST | : | |
| HOMES, | : | |
| Defendant | : | |

**MEMORANDUM**

Before the Court is Defendant United Methodist Homes ("Defendant")'s motion for

summary judgment.  (Doc. No. 11.)  For the reasons that follow, the Court will grant the motion.

## I.     BACKGROUND

### A.     Procedural Background

Plaintiff Nancy Rowker ("Plaintiff"), initiated the above-captioned action by filing a

complaint against Defendant on October 31, 2016.  (Doc. No. 1.)  Plaintiff's complaint alleges

one count of age discrimination in violation of the Age Discrimination in Employment Act

("ADEA"), in connection with her termination from employment by Defendant.  (Id. at 3-4.)  On

July 24, 2017, Defendant filed a motion for summary judgment.  (Doc. No. 11.)  The motion has

been fully briefed and is now ripe for disposition.

### B.     Factual Background[1]

#### 1.     Plaintiff's Employment with Defendant

---

[1] The following relevant facts of record are taken from Defendant's statement of material facts
(Doc. No. 11-1), unless otherwise indicated.  Defendant's statement of material facts contains
specific citations to the record in each numbered paragraph.  Unless otherwise specified, the facts
recited in this section are deemed undisputed.

Plaintiff was employed by Defendant at its retirement facility for aging residents in Tunkhannock, Pennsylvania from 2013 (Doc. No. 1), until her termination on December 1, 2015 (Doc. Nos. 1, 11-1 ¶ 31).  At the time of her termination, Plaintiff was sixty-two (62) years old. (Id. ¶ 5.)  While employed by Defendant, Plaintiff worked as a full-time personal care aide, and as part of her employment, "was tasked with assisting residents on the 3:00 PM to 11:00 PM shift."  (Id. ¶¶ 4, 6.)  As part of her employment, Plaintiff received training on the topic of abuse toward residents, as well as "Defendant's standards regarding treating residents with dignity and respect."  (Id. ¶ 7.)

### 2.    Allegations Concerning Plaintiff's Conduct Toward the Resident

In November of 2015, Plaintiff was assigned to work with a terminally ill resident of Defendant's facility ("the resident").  (Id. ¶ 14.)  While Plaintiff assisted the resident with moving, Plaintiff referred to the resident using the term "thunder thighs."  (Id. ¶¶ 16-22.) Plaintiff admits saying the phrase to the resident twice.  (Id. ¶ 16, Doc. No. 13 ¶ 16.)   Plaintiff maintains that she used the phrase as a term of endearment toward the resident.[2]  (Doc. Nos. 13 ¶ 32, 14 at 1-2.)

Defendant conducted an internal investigation into Plaintiff's conduct toward the resident.  (Doc. No. 11-1 ¶ 20.)  Annette Chickey ("Chickey"), an administrator employed by Defendant, initiated the investigation and asked employees to submit statements if they had any knowledge of Plaintiff's use of the term toward a resident.  (Id. ¶ 20, Doc. No. 13 ¶ 20.)  "At least one of the instances [in] which Plaintiff referred to [the resident] as 'thunder thighs' was witnessed by Plaintiff's coworker, Marilyn Canfield," who "reported Plaintiff's use of the

---

[2] In her brief in opposition to Defendant's motion for summary judgment, Plaintiff states that she used the term when "trying to give aid and encouragement to [the] resident" by indicating physical strength on the part of the resident.  (Doc. No. 14 at 1-2.)

phrase . . . to management by submitting a written statement outlining what she had heard and why she felt Plaintiff's use of the phrase . . . was inappropriate."[3]  (Doc. No. 11-1 ¶¶ 17-18.) That coworker reported that Plaintiff would "say 'gotta lift up these thunder thighs so we could get your pants off,'" and also noted "I just cringe, that's why it was reported, it's not appropriate."  (Id. ¶ 19.)  In addition, two employees submitted statements saying that they witnessed Plaintiff refer to the resident using the phrase "thunder thighs," on November 19, 2015, and November 20, 2015, respectively.[4]  (Doc. No. 11-1 ¶¶ 21-22.)  One of these statements was reported to Plaintiff's Charge Nurse, Robin Pascoe ("Pascoe"), who submitted a statement saying that she confronted Plaintiff about her use of the term toward the resident and that Plaintiff acknowledged that she had used this term.[5]  (Id. ¶¶ 22-23.)

As part of the investigation, Chickey also conducted an interview with Plaintiff.  (Id. ¶ 25.)  Plaintiff confirmed to Chickey "that she had used the term 'thunder thighs'" with respect to the resident, and that Pascoe "had at some point instructed her to cease using the term."  (Id. ¶

---

[3] Although Plaintiff calls into question certain aspects of Canfield's statement and denies "that Ms. Canfield explained why the phrase 'thunder thighs' was inappropriate," Plaintiff "admit[s] that Ms. Canfield testified she wrote and submitted [the statement labeled as] Exhibit 'K.'" (Doc. No. 13 ¶ 16.)

[4] Although Plaintiff agrees that the coworkers did make these statements, the parties disagree as to the timeline of events, with Plaintiff asserting "that none of the statements were provided prior to the investigation and that Chickey solicited the production of the statements." (Doc. No. 13 ¶ 20.)  In addition, Plaintiff asserts that although the relevant exhibits submitted by Defendant purport to be statements from Plaintiff's coworkers, there is no "reference in the record of testimony authenticating the statement[s]." (Id. ¶¶ 21-22.)  However, because Plaintiff admits that her coworkers made these statements, the Court will not address the issue of the authenticity of any supporting documentation offered by Defendants as to the statements.

[5] While Plaintiff appears to deny in part this factual assertion made by Defendant, Plaintiff does not describe why she denies the statement in part.  Rather, Plaintiff's response reads as follows:

> The statement was written at the request of Chickey, who testified she solicited the production of all statements related to the investigation.  However, Plaintiff testified that Pascoe confronted her in regard to using the term "thunder thighs." Plaintiff stated, "she told me that I should stop using the term, and I did."

(Id. ¶ 23) (citations omitted).

26.) Chickey subsequently testified that Plaintiff's use of the phrase "is considered a 'reportable incident' within the meaning of Department of Human Services (DHS) regulations related to resident abuse, in that any act that is construed as abuse, by anyone, is considered to be abuse or suspected abuse that is required to be reported to the state." (Id. ¶ 27.) On November 30, 2015, Chickey reported Plaintiff's use of the phrase to the resident's family, and Chickey subsequently reported the information to the Pennsylvania Department of Human Services ("DHS"), in December of 2015. (Id. ¶ 28.) On December 8, 2015, a DHS employee investigated Plaintiff's use of the term and concluded that Plaintiff's use of the phrase on November 20, 2015 constituted abuse toward a resident in violation of state regulations governing personal care homes.[6] (Id. ¶ 29.)

### 3. Plaintiff's Termination

Pursuant to Defendant's internal policies, abuse of a resident is a basis for immediate termination of employment. (Id. ¶ 30.) As a result of the investigation into Plaintiff's comments, Chickey "terminated Plaintiff's employment on December 1, 2015, and informed Plaintiff that her termination was the result of Plaintiff's 'inappropriate comments,' which [Chickey] deemed to be 'entirely unacceptable.'" (Id. ¶ 31.) While Plaintiff agrees that Chickey stated that resident abuse was the reason for her termination, Plaintiff maintains that her

---

[6] Plaintiff denies this assertion, stating only that "[n]either Exhibit 'Q' or 'R' support this allegation. No signed report of DHS is attached." (Id. ¶ 29.) The DHS report, labeled as Exhibit R to Defendant's motion for summary judgment, states that:

> Staff person A on 11/20/2015 at approximately 10 PM while assisting resident #1 with personal care needs commented that the resident had "Thunder Thighs." Staff person B was present and indicated resident #1 did visually appear upset after hearing the statement. Information secured at the time of investigation indicates that staff person #1 had made the same comment to resident #1 on several different occasions when attending to resident #1. Resident #1 was not treated with dignity and respect.

(Doc. No. 11-19 at 3.) Further, Exhibit R includes a letter signed by a DHS employee indicating that the DHS report, or license inspection summary, is attached to the letter. (Id. at 1.)

comments did not constitute abuse.  (Id. ¶ 32, Doc. No. 13 ¶ 32.)  The parties agree that Plaintiff cannot provide a record of "any individuals who had engaged in or had been accused of resident abuse and who were allowed to keep their job with Defendant."  (Doc. No. 11-1 ¶ 32.)  Plaintiff states that following her termination, she was replaced by an employee approximately fifteen (15) years younger.  (Doc. No. 13-3.)

## II.    STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is material if it might affect the outcome of the suit under the applicable law, and it is genuine only if there is a sufficient evidentiary basis for allowing a reasonable factfinder to return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  At summary judgment, the inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.  Id. at 251-52.  In making this determination, a court must "consider all evidence in the light most favorable to the party opposing the motion."  A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec. & Gas. Co., 364 F.3d 135, 145-46 (3d Cir. 2007).  Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  Berckeley Inv. Grp. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir.

2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted. Celotex, 477 US. at 322. With respect to the sufficiency of the evidence that the non-moving party must provide, a court should grant a motion for summary judgment when the non-movant's evidence is merely colorable, conclusory, or speculative. Anderson, 477 U.S. at 249-50. There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. Id. at 252; see also Matsushita Elec. Indus. Co. v. Mem'l Hosp., 192 F. 3d 378, 387 (3d Cir. 1999).

## III. DISCUSSION

### A. Legal Standard Applicable to Discrimination Claims Under the ADEA

Under the ADEA, an employer is prohibited from discharging an individual or otherwise discriminating against an individual with respect to compensation, terms, conditions, or privileges of employment because of the individual's age. 29 U.S.C. § 623(a)(1). A plaintiff can sustain a claim of discrimination under the ADEA by presenting either direct or circumstantial evidence of discrimination. See Duffy v. Magic Paper Grp., Inc., 265 F.3d 163, 167 (3d Cir. 2001). To prevail on an age discrimination claim, "a plaintiff must establish, by a preponderance of the evidence, that age was the 'but-for' cause of the adverse employment action." Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 644 (3d Cir. 2015) (citation omitted).

Age discrimination claims relying on circumstantial evidence are governed by the three-part framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973). See Smith v. City of Allentown, 589 F.3d 684, 691 (3d Cir. 2009) (reaffirming application of McDonnell Douglas framework to ADEA cases involving indirect evidence). Under this

framework, a plaintiff bears the initial burden of establishing a prima facie case of discrimination. Keller v. Orix Credit All., Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1997)). Establishing a prima facie case of age discrimination creates an "inference of unlawful discrimination." Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 357 (3d Cir. 1999) (quoting Waldron v. SI Indus., Inc., 56 F.3d 491, 494 (3d Cir. 1995)). The elements of a prima facie case of age discrimination are as follows: (1) the plaintiff is at least forty (40) years old; (2) the plaintiff suffered an adverse employment decision; (3) the plaintiff was qualified for the position in question; and (4) the plaintiff was ultimately replaced by another employee who was sufficiently younger so as to support an inference of a discriminatory motive. Burton v. Teleflex Inc., 707 F.3d 417, 426 (3d Cir. 2013). The Third Circuit has indicated that the prima facie case is not "intended to be rigid, mechanized, or ritualistic." Pivirotto, 191 F.3d at 253 (quoting Furnco Constr. Corp. v. Waters, 438 U.S. 566, 577 (1978)). Where the plaintiff is not directly replaced, the fourth element is satisfied if the plaintiff can provide facts which "if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." Id.

Once a plaintiff establishes a prima facie case creating an inference of discrimination, the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason for the adverse employment action." Jones v. Sch. Dist. of Phila., 198 F.3d 403, 412 (3d Cir. 1999) (citing Keller, 130 F.3d at 1108)). The second step of the McDonnell Douglas framework does not require that the employer prove that the articulated legitimate, nondiscriminatory reason was the actual reason for the adverse employment action. Rather, "the employer must provide evidence that will allow the factfinder to determine that the decision was made for nondiscriminatory reasons." Willis, 808 F.3d at 644 (citing Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994)).

If the employer satisfies this second prong, the burden returns to the plaintiff to show, by a preponderance of the evidence, that the employer's proffered legitimate, nondiscriminatory reason was pretextual. Burton, 707 F.3d at 426-27. To survive summary judgment when an employer has articulated a legitimate nondiscriminatory reason for its action, a plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Simpson v. Kay Jewelers, 142 F.3d 639, 644 (3d Cir. 1998) (citing Fuentes, 32 F.3d at 764)).

## B. Plaintiff's ADEA Claim

Defendant does not contest Plaintiff's ability to establish a prima facie case of age discrimination under the ADEA, arguing that the central issue before the Court is whether Defendant is entitled to judgment as a matter of law as to the pretext prong of the burden-shifting framework described supra. (Doc. No. 12 at 8.) Accordingly, the Court will assume for purposes of deciding Defendant's motion that Plaintiff is capable of establishing a prima facie case of age discrimination under the ADEA. Therefore, the Court addresses Defendant's legitimate non-discriminatory reason for Plaintiff's termination and the issue of pretext.

### 1. Legitimate Non-Discriminatory Reason

According to Defendant, "Defendant terminated Plaintiff's employment after an employee reported, and an internal investigation substantiated, that Plaintiff had, on multiple occasions, referred to a terminally ill patient as 'thunder thighs.'" (Id. at 9.) Further, the parties' briefs do not dispute that Defendant's stated reason for terminating Plaintiff was Plaintiff's use of this term. (Doc. Nos. 12, 14, 15.) The Court concludes that, under the

McDonnell Douglas framework, Defendant has met its burden in producing a legitimate non-discriminatory reason for terminating Plaintiff's employment. Accordingly, the Court turns to the issue of pretext.

### 2. Pretext

In order to survive Defendant's motion for summary judgment with respect to pretext, Plaintiff must either discredit Defendant's reason for her termination or put forth sufficient evidence that age discrimination was more likely than not a motivating or determinative factor in her termination. See Fuentes, 32 F.3d at 764. Plaintiff has not met her burden under this standard, as she has pointed to no evidence from which a reasonable factfinder could either disbelieve Defendant's asserted reason for her termination or conclude that age discrimination was more likely than not a motivating or determinative cause of her termination.

### a. Specific Arguments by Plaintiff

Plaintiff advances various arguments in support of her assertion that Defendant's stated legitimate non-discriminatory reason for terminating her was pretextual. First, Plaintiff cites proceedings before the Unemployment Compensation Board of Review, in which the Unemployment Compensation Referee concluded that, as to the reasons given by Defendant for Plaintiff's termination, "[s]uch an act cannot be found to be considered resident abuse." (Doc. No. 14 at 6) (alteration in original). Plaintiff states that this finding demonstrates that her explanation for the comment toward the resident – that the term "thunder thighs" was actually meant as a term of endearment – is "perfectly reasonable" because the Unemployment Compensation Referee is an independent factfinder who "has already believed" Plaintiff's explanation. (Id. at 8.) Additionally, Plaintiff maintains that as a result of this finding,

Defendant is collaterally estopped from litigating the issue of whether Plaintiff's conduct constituted resident abuse. (Id. at 6.)

The Court rejects each of the aforementioned arguments advanced by Plaintiff. Initially, any determination by the Unemployment Compensation Referee that Plaintiff's use of the term "thunder thighs" was not abusive is irrelevant for purposes of this Court deciding whether Plaintiff has met her burden of pointing to some evidence from which a reasonable factfinder could conclude that her termination was a pretext for discrimination. See, e.g., Williamson v. Penn Millers Ins. Co., No. 3:04-cv-1142, 2005 WL 3440633, at *7 (M.D. Pa. Dec. 14, 2005) (noting that "the Referee's decision would not allow a reasonable jury to discredit [the defendant's] legitimate non-discriminatory reasons").[7] Furthermore, collateral estoppel does not preclude Defendant from litigating the reasons for its termination of Plaintiff in light of the Referee's finding. See, e.g., Mathis v. Christian Heating & Air Conditioning, Inc., 91 F. Supp. 3d 651, 657-58 (E.D. Pa. 2015) (stating that "under Pennsylvania law[,] findings of fact and conclusions of law made with respect to claims for unemployment compensation do not have preclusive effect in subsequent actions"); see also Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 110-11 (1991) (acknowledging the "implication that the federal courts should recognize no preclusion by state administrative findings with respect to age-discrimination

_____

[7] In Williamson, the district court noted that the issue before the Unemployment Compensation Board was whether the plaintiff's conduct was considered willful for purposes of receiving unemployment compensation, and not whether the employer was correct in its decision to terminate the plaintiff's employment. See Williamson v. Penn Millers Ins. Co., No. 3:04-cv-1142, 2005 WL 3440633, at *8 (M.D. Pa. Dec. 14, 2005) ("Therefore, the Board's decision to grant unemployment benefits does not undermine the credibility of [the defendant's] legitimate nondiscriminatory reasons for terminating [the plaintiff's] employment."). Like Plaintiff in the instant action (Doc. No. 13-1 at 3), the plaintiff in Williamson had been granted unemployment benefits after the Unemployment Compensation Board concluded that her conduct was not willful. See Williamson, 2005 WL 3440633, at *7. Further, the district court granted the defendants' joint motion for summary judgment. See id. at *9.

claims"). The Court concludes that the Unemployment Compensation Board Referee's finding does not provide a basis from which a reasonable factfinder could conclude that Plaintiff's termination was a pretext for age discrimination.

Furthermore, Plaintiff's arguments with respect to the deposition testimony relied upon by Defendant lack merit. While Plaintiff makes various assertions as to the ability of certain witnesses to recall specific information in their testimony,[8] such arguments are irrelevant to the issues of whether a genuine dispute of material fact exists and whether Defendant is entitled to judgment as a matter of law. Although Plaintiff attempts to cast doubt on the quality of the testimony cited by Defendant, Plaintiff does not demonstrate that a genuine dispute of material fact exists. Plaintiff may dispute the authenticity of the statements provided by her former coworkers, but Plaintiff does not dispute that the coworkers actually made the given statements in connection with the investigation into Plaintiff's conduct toward the resident. Accordingly, Plaintiff's arguments do not alter the facts surrounding her termination: that she was investigated for referring to the resident as "thunder thighs," that she admitted to doing so at least twice, that Defendant considered her conduct abusive and thus a basis for termination, and that a state regulatory body's independent investigation found that Plaintiff's conduct constituted abuse toward a resident. Consequently, Plaintiff has not met her burden in demonstrating that a reasonable factfinder could conclude that her termination was pretextual.

---

[8] Specifically, Plaintiff takes issue with Canfield's testimony, stating that:
> Canfield does not know when she submitted [the statement] . . . does not know when Plaintiff first used the phrase "thunder thighs" . . . does not know when any of the alleged events occurred . . . does not know when Plaintiff last used the phrase "thunder thighs" . . . and claims [the statement] was submitted to no particular person . . . which is also contrary to Chickey's testimony, that Chickey solicited the production of the Canfield statement and in fact solicited production of all the statements.

(Doc. No. 14 at 7.)

### b.     Defendant's Reason for Terminating Plaintiff

In addition, as noted above, Defendant's stated reason for terminating Plaintiff's employment is that Plaintiff referred to a terminally-ill patient using the term "thunder thighs," which Defendant considered abusive and grounds for termination. (Doc. Nos. 11-1 ¶ 30, 12 at 8-9.) The undisputed facts and the record before the Court do not indicate that any other reason, including discrimination on the basis of age, influenced Defendant's decision to terminate Plaintiff. Plaintiff admits that "[o]n two occasions," she "referred to [the resident] using the phrase 'thunder thighs,'" and that "[a]t least one of the instances [in] which Plaintiff referred to [the resident] as 'thunder thighs' was witnessed by Plaintiff's coworker, Marilyn Canfield." (Doc. Nos. 11-1 ¶ 17, 13 ¶¶ 16, 17.) Plaintiff further admits that Canfield reported Plaintiff's use of that phrase to management via a written statement. (Doc. Nos. 11-1 ¶ 18, 13 ¶ 18.) Finally, Plaintiff admits that other coworkers also claimed to have witnessed her using this term on at least one occasion, and that Plaintiff's charge nurse had written a statement about speaking with Plaintiff regarding the language she used toward the resident. (Doc. Nos. 11-1 ¶¶ 21-23, 13 ¶¶ 21-23.) While Plaintiff disputes various aspects of the testimony cited by Defendant in support of these facts, the undisputed facts of record provide no basis for a reasonable factfinder either to disbelieve that Defendant terminated Plaintiff's employment as a result of its investigation into her use of the term "thunder thighs" in reference to a resident, or to conclude that Defendant's decision to terminate Plaintiff was the product of a discriminatory motive.

In addition, the relevant facts demonstrate that Defendant terminated Plaintiff because it considered Plaintiff's language to constitute resident abuse pursuant to its own internal policies. Chickey testified that "Plaintiff's use of the term 'thunder thighs' is considered a 'reportable incident' within the meaning of the Department of Human Services (DHS) regulations related to

resident abuse, in that any act that is construed as abuse, by anyone, is considered to be abuse or suspected abuse that is required to be reported to the state." (Doc. No. 11-1 ¶ 27.) After Chickey reported the incident to the resident's family and DHS,[9] "an investigator from DHS . . . conduct[ed] an investigation into Plaintiff's conduct, and in drafting his [v]iolation [r]eport . . . confirmed that Plaintiff's statement constituted an act of resident abuse."[10] (Id. ¶ 29.) Although Plaintiff disputes the import of DHS's characterization of her conduct as abusive, Plaintiff's argument does not render summary judgment in favor of Defendant improper. As Defendant noted in support of its motion for summary judgment, "[w]hether Defendant was wrong when it determined Plaintiff's statements were abusive[,] rather than a form of support for the [resident] in question[,] is irrelevant. The core issue is whether Defendant acted with discriminatory animus, not whether Defendant correctly assessed Plaintiff's state of mind at the time she referred to her patient as 'thunder thighs.'" (Doc. No. 12 at 12.) The Court agrees with Defendant, as Defendant investigated Plaintiff's conduct and reported its findings to the resident's family and DHS as it was legally required to do, Plaintiff's conduct was considered abusive and thus grounds for termination in accordance with Defendant's internal policies and procedures, and a separate investigation by DHS found the conduct to constitute abuse for purposes of the applicable regulations. Regardless of Plaintiff's position that the comment was

---

[9] Plaintiff maintains that Defendant's report to DHS was made in an untimely manner, "which constituted an additional violation" of the applicable regulations. (Doc. No. 13 ¶ 28.) However, this aspect of the report is irrelevant because it does not negate the fact that Defendant reported Plaintiff's conduct to DHS, which Plaintiff admits.

[10] Although Plaintiff denies this factual assertion in her counterstatement of material facts, Plaintiff's response indicates that Plaintiff does not actually dispute that this allegation was made. Instead, Plaintiff states that "[n]either Exhibit 'Q' or 'R' support this allegation. No signed report of DHS is attached. Likewise, the referenced passages of Exhibits 'B' and 'L' do not support this allegation. Paragraph 29 is unsupported by the record and should be stricken." (Id. ¶ 29.) The Court concludes that, despite Plaintiff's response, Exhibit R (Doc. No. 11-19), does support the DHS's conclusion that the complained-of conduct by Plaintiff constituted an act of abuse for purposes of the applicable state regulations.

13

not "abusive," Plaintiff has not met her burden of pointing to evidence from which a reasonable factfinder could conclude that her termination was a pretext for age discrimination.

## IV.  CONCLUSION

Based on the foregoing, the Court will grant Defendant's motion for summary judgment. (Doc. No. 11.)  An appropriate Order follows.